1  BRENDAN DOLAN, State Bar No. 126732
   MORGAN, LEWIS & BOCKIUS LLP
2  One Market Street
   San Francisco, CA 94105
3  Tel: 415.442.1000
   Fax: 415.442.1001
4
   CLIFFORD D. SETHNESS, State Bar No. 212975
5  MORGAN, LEWIS & BOCKIUS LLP
   300 South Grand Avenue
6  Twenty-Second Floor
   Los Angeles, CA 90071-3132
7  Telephone:     213.612.2500
   Fax:           213.612.2554
8
   *Attorneys for Plaintiffs*
9  PACIFIC MARITIME ASSOCIATION and
   APM TERMINALS PACIFIC, LTD.
10

*E-filing*

*FILED*

SEP - 6 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

ADR

11              UNITED STATES DISTRICT COURT

12              NORTHERN DISTRICT OF CALIFORNIA

13

14  PACIFIC MARITIME ASSOCIATION, a          Case No. **C07-04618 EMC**
    California corporation; APM
15  TERMINALS PACIFIC, LTD., a              **DECLARATION OF RICHARD**
    California corporation.                  **MARZANO IN SUPPORT OF**
16                                           **PLAINTIFF'S APPLICATION FOR**
                   Plaintiffs,               **TEMPORARY RESTRAINING ORDER**
17
           vs.
18
    INTERNATIONAL LONGSHORE AND
19  WAREHOUSE UNION, an
    unincorporated labor organization;
20  INTERNATIONAL LONGSHORE AND
    WAREHOUSE UNION, LOCAL 10, an
21  unincorporated labor organization,

22                 Defendants.

23
           I, Richard Marzano, declare as follows:

24         1.      I am the Director of Contract Administration and Arbitration for the Pacific

25  Maritime Association ("PMA"), a plaintiff in this case. As the Director of Contract

26  Administration and Arbitration, I oversee and coordinate several aspects of PMA's administration

27  of the collective bargaining agreement with the International Longshore and Warehouse Union

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

DECLARATION OF RICHARD MARZANO

ORIGINAL

1  (ILWU) and its various locals including Local 10.  I personally prepared and presented PMA's

2  and APMT's case at the arbitration hearing held before Coast Arbitrator John Kagel on

3  September 4, 2007 regarding the work slowdown at the Oakland terminal of APM Terminals

4  Pacific.  In recent days I have been in daily communication with Mark Simpson and other APMT-

5  Oakland representatives regarding the work slowdown at their terminal.  I have personal

6  knowledge of the facts set forth in this declaration, and would testify competently as to those facts

7  if called as a witness.

8          2.      PMA is, and at all times mentioned herein was, a non-profit corporation organized

9  and existing under and by virtue of the laws of the State of California. PMA maintains its

10  principal office at 555 Market Street, Third Floor, San Francisco, California.

11          3.      PMA is a multiemployer collective bargaining association whose members include

12  stevedoring, terminal, and shipping companies that employ dockworkers, such as longshore

13  workers, in the San Francisco Bay Area and throughout the United States Pacific Coast. PMA

14  represents said employers in their collective bargaining relations with the employee labor

15  organizations representing dockworkers in the negotiation of collective bargaining agreements

16  and the administration and enforcement of the provisions thereof.

17          4.      Defendant International Longshore and Warehouse Union ("ILWU") is an

18  unincorporated association commonly known as a labor union and maintains its principal offices

19  in San Francisco, California.  ILWU is, and at all times mentioned herein was, the duly certified

20  collective bargaining representative for dockworkers employed by members of PMA on the

21  Pacific Coast.  ILWU, on behalf of itself and each of its longshore locals in California, Oregon

22  and Washington, including Defendant ILWU Local 10 ("Local 10"), negotiates and enters into

23  collective bargaining agreements with PMA, covering terms and conditions of employment of

24  dockworkers employed by PMA members on the Pacific Coast.

25          5.      Local 10 is an unincorporated association commonly known and referred to as a

26  labor union and maintains its principal offices in San Francisco, California.  Local 10 is a local of

27  ILWU and is, and at all times mentioned herein has been, a representative of longshore workers

28  employed by members of PMA in the San Francisco Bay Area Ports of San Francisco and

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

2

DECLARATION OF RICHARD MARZANO

1    Oakland.

2         6.    ILWU, on behalf of its longshore locals in California, Oregon and Washington,

3    including defendant Local 10, and all employees performing work thereunder, and PMA on

4    behalf of its members, entered into the Pacific Coast Longshore Contract Document 2002-2008,

5    effective as of July 1, 2002 (hereinafter the "PCLCD"). The PCLCD covers longshore workers

6    employed by PMA members in the San Francisco Bay Area. The PCLCD is, and at all times

7    mentioned herein was, in full force and effect. Defendants have copies of the PCLCD. True and

8    correct copies of the relevant portions of the PCLCD are attached hereto as Exhibit A.

9         7.    Defendants ILWU and Local 10, and their officers and members, and all persons

10   working under the PCLCD, are under a duty to abide by the PCLCD's no-strike and grievance

11   and arbitration provisions.

12        8.    There are various classifications of waterfront workers on the Pacific Coast.

13   Generally speaking, longshore workers perform the physical loading and unloading of waterborne

14   cargo onto and off of vessels, railcars, and trucks, usually by use of a crane. Crane operators are

15   longshore workers. All longshore workers at the Ports of San Francisco and Oakland are

16   represented by ILWU Local 10. The terms and conditions of longshore work are governed by the

17   PCLCD. Marine clerks process cargo information for delivery and shipment, usually through

18   sophisticated computer systems at each terminal. Clerks at the Ports of San Francisco and

19   Oakland are represented by ILWU Local 34. The terms and conditions of marine clerk work are

20   governed by the Pacific Coast Clerks Contract Document (PCCCD). Foremen are the highest-

21   level unionized waterfront workers; they supervise the longshore workers and report directly to

22   company management. Foremen at the Ports of San Francisco and Oakland are represented by

23   ILWU Local 91. The terms and conditions of foreman work are governed by the Pacific Coast

24   Walking Bosses and Foremen's Agreement (PCWBFA).

25        9.    For many years, the employers at the Oakland Port have agreed to pay certain

26   foremen a generous pay guarantee, pursuant to the maximum allowable under the PCWBFA.

27   Under that agreement, those foremen have received pay for a certain minimum number of hours

28   regardless of how many hours the foreman actually worked during the payroll period. This has

1    given those foremen the benefit of pay for up to 84 hours per week without the obligation to work

2    anywhere near 84 hours.  Several foremen received an 84 hour work pay guarantee yet worked

3    only 48 – 70 hours of work.

4        10.    On August 9, 2007, APMT informed its steady foremen that, going forward, pay

5    guarantee calculations would be based on pay for hours worked and an individual's availability to

6    work when APMT so requested.  For example, a foreman who normally worked on a vessel

7    would be required to cover yard/gate operations when the regular yard foreman took a day off,

8    and if the vessel foreman refused to cover the yard shift, those hours would be deducted from the

9    weekly pay guarantee.  Prior to this change, APMT would allow the vessel foreman to stay home,

10   with no loss in pay, and an extra foreman form the dispatch hall would be ordered to cover the

11   yard foreman's shift.

12       11.    On August 18, 2007, I was informed by PMA representatives in Oakland that the

13   crane operators at APMT's Oakland facility were engaging in a work slowdown, apparently to

14   protest the changes in the foremen guarantee.  APMT presented to the PMA-Oakland office

15   production reports showing a dramatic decrease in production for the first shift on the vessel

16   *Maersk Dublin* on that date, compared to a five-week average for similar vessel service.

17       12.    That same day, PMA referred the issue to the Northern California Area Arbitrator,

18   Terry Lane.  The Arbitrator took testimony and evidence from both sides, including APMT's

19   production reports that showed a 43% decrease in productivity on the first shift of August 18,

20   2007, as compared to a five-week average for similar vessel service.  On August 20, 2007,

21   Arbitrator Lane issued a written decision (NCAA-034-2007), ruling that "ILWU Local 10

22   officials and members are in violation of Section 11.1 by engaging in a slowdown tantamount to a

23   work stoppage" and that "Local 10, its officials and members, shall cease the slowdown and the

24   Union shall advise its members to work as directed in accordance with Section 11.31."  A true

25   and correct copy of NCAA-034-2007 is attached hereto as Exhibit B.

26       13.    On August 22, 2007, PMA sought another ruling from Arbitrator Lane that Local

27   10 was continuing its work slowdown in violation of Section 11.1.  At the hearing, APMT

28   presented evidence that productivity during the first shift on the vessel *Sealand Enterprise* was

1    down 23.9% as compared to a five-week average for similar vessel service. On August 23, 2007,

2    Arbitrator Lane issued another written decision (NCAA-036-2007), ruling that "ILWU Local 10

3    longshoremen at the APM Terminals did engage in a slowdown tantamount to a work stoppage in

4    violation of Section 11.1 on August 22, 2007 on the Sealand Enterprise." The Arbitrator's ruling

5    further stated that "ILWU Local 10 has not implemented Decision NCAA-034-2007. ILWU

6    Local 10 officials shall instruct the longshoremen at the APM Terminals to cease and desist from

7    violating Section 11.1 and to implement Arbitration Decisions in accordance with Section 17.57."

8    The ruling concluded that, because the local grievance machinery had failed to end the work

9    slowdown, the matter was referred to the Coast Labor Relations Committee ("CLRC"), the next

10    step in the contractual grievance-arbitration process. A true and correct copy of NCAA-036-2007

11    is attached hereto as Exhibit C.

12        14.    On September 4, 2007, the CLRC reached disagreement on compliance with

13    NCAA-036-2007 and the matter was automatically referred to Coast Arbitrator John Kagel, the

14    final step in the grievance-arbitration process. The Coast Arbitrator conducted a telephonic

15    hearing on September 4, 2007, in which I represented PMA and APMT. Leal Sundet represented

16    the ILWU. The Coast Arbitrator issued a written decision that same night confirming NCAA-

17    036-2007 and stating that "ILWU Local 10 longshoremen at the APM Terminals shall forthwith

18    cease and desist from engaging in slowdowns at that location" and "ILWU Local 10 officials

19    shall continue to instruct the longshoremen at the APM Terminal to cease and desist from

20    violating Section 11.1 and to implement arbitration decisions in accordance with Section 17.57."

21    A true and correct copy of the Coast Arbitrator's award (C-06-2007) is attached hereto as Exhibit

22    D.

23        15.    On September 5, 2007, I was informed by Mark Simpson of APMT that Local 10

24    still had not complied with the Area and Coast Arbitrators' awards and that Local 10

25    longshoremen were still engaging in a work slowdown in violation of the contract. On September

26    6, 2007, I notified Local 10's President, Thomas Clark, by facsimile and e-mail that PMA would

27    ///

28    ///

1   seek a temporary restraining order in federal court on September 6 to enforce compliance with the

2   awards.  A true and correct copy of my letter is attached hereto as Exhibit E.

3        I declare under penalty of perjury under the laws of the United States of America that the

4   foregoing is true and correct.

5        Executed this 6th day of September, 2007, at San Francisco, California.

6

7                                                         Richard Marzano

1-LA/955989.1

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MORGAN, LEWIS &
BOCKIUS LLP
ATTORNEYS AT LAW
SAN FRANCISCO

                            6                    DECLARATION OF RICHARD MARZANO

# PACIFIC COAST LONGSHORE CONTRACT DOCUMENT

## July 1, 2002 – July 1, 2008

*Between*

### INTERNATIONAL LONGSHORE AND WAREHOUSE UNION

*and*

### PACIFIC MARITIME ASSOCIATION

Name _____

Port _____

Local No. _____  Reg. No. _____

## SECTION 11

# NO STRIKES, LOCKOUTS, AND WORK STOPPAGES

**11.1** There shall be no strike, lockout or work stoppage for the life of this Agreement.

**11.2** The Union or the Employers, as the case may be, shall be required to secure observance of this Agreement.

**11.3** How work shall be carried on.

**11.31** In the event grievances or disputes arise on the job, all men and gangs shall continue to work as directed by the employer in accordance with the specific provisions of the Agreement or if the matter is not covered by the Agreement, work shall be continued as directed by the employer.

**11.4** Exceptions and Procedures for Health and Safety and Onerous Workload.

**11.41** Health and safety exception. Longshoremen shall not be required to work when in good faith they believe that to do so is to immediately endanger health and safety. Only in cases of bona fide health and safety issues may a standby be justified. The Union pledges in good faith that health and safety will not be used as a gimmick. The employer shall have the option of having the men who raise a question of health and safety stand by until a decision is reached or "working around" the situation until it can be resolved, and no further work shall be performed on that disputed operation until the health and safety issue is resolved.

**11.42** Onerous workload exception. Longshoremen on cargo handling operations shall not be required to work when in good faith they believe that to do so will result in an onerous workload. The Union pledges in good faith that the onerous workload claim will not be used as a gimmick. The employer

shall have the option of having the men claiming onerousness stand by until a decision is reached or "working around" the situation until it can be resolved.

**11.421** When a man is directed to take his own relief without a man being assigned to relieve him, this does not automatically present a question of onerousness of work or individual speedup for the men remaining on the job, regardless of the basic gang structure involved. A change in operations or manning to remove unnecessary men, or the handling of larger loads does not, in and of itself, automatically present any question of onerousness of work or individual speedup.

**11.422** The procedure provided in Section 11.42 shall not apply on operations where the Association and the Union have agreed to changed operations or reduced manning under Sections 10.3 and 10.5. If claims of onerousness are presented in such cases, they shall be referred to the Joint Coast Labor Relations Committee.

**11.4221** The foregoing Section 11.422 is intended to mean that agreements reached on changed operations or reduced manning in accordance with the Contract procedures shall not be challenged as being onerous operations if no further change has been made following such agreement. In other words, claims of onerousness shall not be used to challenge agreed manning if the operation is unchanged in all respects. Any such challenges shall be referred to the Joint Coast Labor Relations Committee.

**11.43** General Procedures for Health and Safety and Onerous Disputes.

**11.431** The men must ask their steward to bring the question of health, safety or onerousness to the attention of the foreman or walking boss in immediate charge of the operation. The steward and his immediate superior (gang boss, hatch

boss, etc.) are the only individuals who shall present the situation to the foreman or walking boss.

**11.432** If agreement cannot be reached in Section 11.431 the Business Agent shall be called. (The walking boss, gang boss or hatch boss and the Business Agent or steward, who are responsible and safety-minded individuals should be able to determine whether a condition is safe or unsafe.)

**11.433** If agreement cannot be reached in Section 11.432, an immediate Joint Port Labor Relations Committee meeting shall be called on the job.

**11.434** If agreement cannot be reached in Section 11.433, the Area Arbitrator shall be called to the job for an immediate ruling.

**11.44** Health and Safety Procedure.

**11.441** The Area Arbitrator shall make an immediate ruling as to how work shall proceed. After the work proceeds the Arbitrator shall make a further ruling that a bona fide health or safety issue did or did not exist.

**11.442** Where the Arbitrator decides or where agreement is reached in any one of the steps under Section 11.43 that the employers were correct, the men shall not be paid for standby time, if involved.

**11.443** Where the Arbitrator decides or where agreement is reached in any one of the steps under Section 11.43 that the men were correct, the men shall be paid for standby time, if involved.

**11.444** If the Arbitrator decides or it is agreed at any step under Section 11.43 that an unsafe condition exists which can be corrected, the men shall work as directed to correct such condition.

**11.445** If it is determined at any step under Section 11.43 that the condition claimed to be unsafe is in fact safe, the men shall resume work as directed and failure to resume work as directed shall be cause to remove the men from the payroll as of the time of standby.

**11.446** If during a period of standby on an issue of health and safety any man leaves his place of work except upon instructions of the walking boss, he shall be removed from the payroll as of the time of standby regardless of how the issue is settled. Any man who so leaves without obtaining his own replacement shall be automatically subject to appropriate penalties under the grievance machinery.

**11.45** Onerous Work Load Procedure.

**11.451** The Area Arbitrator shall make an immediate ruling as to whether the original direction of the employer did or did not impose an onerous workload.

**11.452** After the employer has directed the men as to how work shall proceed on the basis of the Arbitrator's ruling and the work proceeds in accordance with the direction of the employer, the Arbitrator shall make a further ruling that a bona fide question of onerousness of the workload did or did not exist.

**11.453** Where the Arbitrator decides or where agreement is reached in any one of the steps under Section 11.43 that to work in accordance with the employer's original direction did not impose an onerous workload and the employer exercised his option to have the men claiming onerousness stand by until a decision is reached, the men shall not be paid for standby time and may be required to work beyond the time the shift otherwise would end to make up the time the men stood by.

**11.4531** Such makeup time shall not exceed 2 hours, and the work will be performed at the rate applicable.

The first 8 hours of time paid for, including "makeup" time on the standard first and second shift and the first 5 hours of time paid for, including "makeup" time on the third shift shall be paid at the appropriate shift rates. If work goes beyond the standard shifts as set forth in Section 2.4 in order to complete as much as possible of a regular or extended shift, such work shall be paid at the appropriate shift overtime rate. When "makeup" time is worked, and the work goes beyond 5 hours without a meal period, the employees involved shall have the option of going to a meal on their own time and returning to complete the "makeup" time, or of finishing the "makeup" time without going to a meal.

**11.454** Where the Arbitrator decides or where agreement is reached in any one of the steps under Section 11.43 that the original direction of the employer as to how work should proceed did impose an onerous workload and the employer exercised his option to have the men stand by until a decision is reached, the men shall be paid for standby time.

**11.455** If the Arbitrator decides or it is agreed at any one of the steps under Section 11.43 that the original direction of the employer does not impose an onerous workload and if the men are directed to resume work as originally directed, any failure to resume work as directed shall be the cause to remove the men from the payroll as of the time the men were directed by the employer to stand by if the employer had not directed them to "work around" the situation, or as of the time the men fail to resume work as directed.

**11.456** If during a period of standby or an onerous issue any man leaves his place of work except upon instructions of the walking boss, he shall be removed from the payroll as of the time of standby regardless of how the issue is settled. Any man who so leaves without obtaining his own replacement

shall be automatically subject to appropriate penalties under the grievance machinery.

**11.46** Application of Contract Grievance Machinery.

**11.461** The grievance machinery, pending investigation and adjudication of on the job disputes, requires that work shall be performed in accordance with specific provisions of the Agreement, or if the matter is not covered by the Agreement, work shall be continued as directed by the employer. Exceptions to this arise only where longshoremen in good faith believe that to do so is to immediately endanger health and safety or in good faith believe that to do so imposes an onerous workload.

**11.462** The preceding procedures apply specifically to issues initially presented as being a dispute under health or safety or a dispute as to onerousness. On all other issues, the authority of the walking boss or foreman to remove men from the payroll for cause is not disturbed.

**11.463** Should the Arbitrator rule that the issue of health or safety or onerousness was raised as a gimmick, the Employers may process the matter through the grievance procedure for appropriate penalties.

**11.464** The contract machinery is the same in all disputes. The preceding procedures covering disputes on health and safety and onerousness are not intended to modify the basic grievance machinery structure.

**11.5** Picket Lines. *(See Addenda, Picket Line Language.)*

**11.51** Refusal to cross a legitimate and bona fide picket line, as defined in this paragraph, shall not be deemed a violation of this Agreement. Such a picket line is one established and maintained by a union, acting independently of the ILWU longshore locals, about the premises of an employer with whom it is engaged in a bona fide dispute over wages, hours or

working conditions of employees, a majority of whom it represents as the collective bargaining agency. Collusive picket lines, jurisdictional picket lines, hot cargo picket lines, secondary boycott picket lines and demonstration picket lines are not legitimate and bona fide picket lines within the meaning of this Agreement.

**11.52** If an ILWU longshore local located within the confines of the United States whose members are not covered by this Agreement is engaged in a legitimate, bona fide, nonjurisdictional and noncollusive strike concerning wages, hours or working conditions of its members, no longshoreman under this Agreement shall be required to perform work hereunder respecting cargo that normally, without such strike, would be handled by members of such ILWU longshore local but which has been handled or is destined to be handled by other workers engaged in strikebreaking activities under established and legitimate trade union principles.

## SECTION 12

# MEETINGS FOR REGISTERED LONGSHOREMEN

**12.1** In addition to other qualifications specifically set forth in this Contract Document, all registered longshoremen in order to remain qualified and eligible for dispatch through the dispatching hall must be familiar with all the provisions of the Agreement, including all working, dispatching and safety rules and the requirements of conformance and performance under the Agreement.

**12.2** To this end it shall be the duty of the Union to inform all registered Union longshoremen of their collective and individual responsibilities under the Agreement. Similarly, it shall be the duty of the Joint Port Labor Relations Committee to inform

all registered nonunion longshoremen of such responsibilities. Meetings for such purposes shall be scheduled by mutual consent of the Joint Port Labor Relations Committee.

**12.3** Stop-Work Meetings.

**12.31** Each local shall have the right to hold 1 regularly scheduled stop-work meeting each month during overtime hours on the second shift. *(See Addenda, Scheduling of Meetings.)*

**12.311** In a port where such regularly scheduled stop-work meetings are held, the scheduled date during the month shall be the same for the longshore local and the clerks' local.

**12.32** Any other stop-work meetings must be mutually agreed to by PMA and the Union and PMA shall receive at least 1 week's notice of such nonscheduled meetings. They shall not occur more often than once a month.

**12.4** Any registered longshoreman refusing to attend such respective meetings or creating a disturbance which frustrates the purpose of the same shall be suspended or dropped from the registered list at the discretion of the Joint Port Labor Relations Committee.

## SECTION 13

# NO DISCRIMINATION

**13.1** There shall be no discrimination in connection with any action subject to the terms of this Agreement (including at work sites, joint dispatch halls, training sites, and other locations, when reasonably related to employment covered by this Agreement) either in favor of or against any person because of membership or nonmembership in the Union, activity for or against the Union or absence thereof, race, creed, color, sex (including gender, pregnancy, sexual orientation), age (forty or over), national origin, religious or political beliefs, disability,

conditions and practices of the men on the job. It is further intended that this program will produce mutually practical and effective recommendations regarding corrections of accident-producing circumstances and conditions.

# SECTION 17

## JOINT LABOR RELATIONS COMMITTEES, ADMINISTRATION OF AGREEMENT, AND GRIEVANCE PROCEDURES

17.1  Joint Labor Relations Committees.

17.11  The parties shall establish and maintain, during the life of this Agreement, a Joint Port Labor Relations Committee for each port affected by this Contract Document, 4 Joint Area Labor Relations Committees, and a Joint Coast Labor Relations Committee. Each of said Labor Relations Committees shall be comprised of 3 or more representatives designated by the Union and 3 or more representatives designated by the Employers. Each side of the committee shall have equal vote.

17.12  The duties of the Joint Port Labor Relations Committee shall be:

17.121  To maintain and operate the dispatching hall.

17.122  To exercise control of the registered lists of the port, as specified in Section 8.3.

17.123  To decide questions regarding rotation of gangs and extra men.

17.124  To investigate and adjudicate all grievances and disputes according to the procedure outlined in this Section 17.

17.125  To investigate and adjudicate any complaint against any longshoreman whose conduct on the job, or in the dispatching hall, causes disruption of normal harmony in the relationship of the parties hereto or the frustration and/or vio-

lation of the provisions of the working or dispatching rules or of this Agreement. The application of this Section 17.125 shall not negate the procedure for penalties as provided for in Section 17.7.

17.126  To carry out such other functions as are assigned to it herein or by the parties, directly or through the Joint Coast Labor Relations Committee.

17.13  There shall be a Joint Area Labor Relations Committee for each of the 4 port areas (Southern California, Northern California, Columbia River and Oregon Coast Ports, and Washington). Such Committee shall investigate and adjudicate grievances not settled at the local level. The Area Joint Labor Relations Committee step may be eliminated by agreement at the area level or may be bypassed by agreement at the port level.

17.14  The Joint Coast Labor Relations Committee shall function in the administration of this Agreement as provided herein and shall investigate and adjudicate grievances as provided herein.

17.141  All meetings of the Joint Coast Labor Relations Committee and all arbitration proceedings before the Coast Arbitrator shall be held in the City and County of San Francisco, State of California, unless the parties shall otherwise stipulate in writing.

17.15  The grievance procedure of this Agreement shall be the exclusive remedy with respect to any disputes arising between the Union or any person working under this Agreement or both, on the one hand, and the Association or any employer acting under this Agreement or both, on the other hand, and no other remedies shall be utilized by any person with respect to any dispute involving this Agreement until the grievance procedure has been exhausted.

**17.151** Any dispute in which the Association or the Union asserts that any dispatching hall is dispatching employees who were not entitled to be dispatched or who were dispatched out of sequence as to other persons entitled to priority dispatch shall be subject to prompt resolution through the grievance procedure of the Agreement when a complaint is filed by either party with the Joint Port Labor Relations Committee. If such complaint is not resolved within 7 days from the date of filing, the matter shall be referred to the Area Arbitrator whose decision shall be final and binding. The grievance procedure shall then be deemed "exhausted."

**17.16** Pending investigation and adjudication of such disputes work shall continue and be performed as provided in Section 11.

**17.2** Grievances arising on the job shall be processed in accordance with the procedure hereof beginning with Section 17.21. Other grievances as to which there are no specific provisions herein shall be processed in accordance with the provisions hereof beginning with Section 17.23.

**17.21** The gang steward and his immediate supervisor, where the grievance is confined to 1 gang, or any 1 steward who is a working member of an affected gang where the grievance involves more than 1 gang or a dock operation, shall take the grievance to the walking boss, or ship or dock foreman in immediate charge of the operation.

**17.22** If the grievance is not settled as provided in Section 17.21, it shall be referred for determination to an official designated by the Union and to a representative designated by the Employers.

**17.23** If the grievance is not settled as provided in Section 17.21 or Section 17.22 or does not arise on the job, it shall be

referred to the Joint Port Labor Relations Committee which shall have the power and duty to investigate and adjudicate it.

**17.24** In the event that the Employer and Union members of any Joint Port Labor Relations Committee shall fail to agree upon any question before it, such question shall be immediately referred at the request of either party to the appropriate Joint Area Labor Relations Committee for decision.

**17.25** In the event that the Employer and Union members of any Joint Area Labor Relations Committee fail to agree on any question before it, such question shall be immediately referred at the request of either party to the Area Arbitrator for hearing and decision, and the decision of the Area Arbitrator shall be final and conclusive except as otherwise provided in Section 17.26.

**17.26** The Joint Coast Labor Relations Committee has jurisdiction to consider issues that are presented to it in accordance with this Agreement and shall exercise such jurisdiction where it is mandatory and may exercise it where such jurisdiction is discretionary as provided in Section 17.261, Section 17.262 and other provisions of this Agreement.

**17.261** Any decision of a Joint Port or Joint Area Labor Relations Committee or of an Area Arbitrator claimed by either party to conflict with this Agreement shall immediately be referred at the request of such party to the Joint Coast Labor Relations Committee (and, if the Joint Coast Labor Relations Committee cannot agree to the Coast Arbitrator, for review). The Joint Coast Labor Relations Committee, and if it cannot agree, the Coast Arbitrator, shall have the power and duty to set aside any such decision found to conflict with the Agreement and to finally and conclusively determine the dispute. It shall be the duty of the moving party in any case brought before the Coast Arbitrator under the provisions of this Section 17.261 to

make a prima facie showing that the decision in question conflicts with this Agreement, and the Coast Arbitrator shall pass upon any objection to the sufficiency of such showing before ruling on the merits.

**17.262** The Joint Coast Labor Relations Committee and the Coast Arbitrator shall have power to review decisions relative to the operation of dispatching halls, or the interpretation of port working and dispatching rules, or discharges, or pay (including travel pay and penalty rates), but shall exercise it in any case only if the Committee decides to review the specific case.

**17.263** When either the Union or the Association claims that there has been a violation of Section 13 by anyone bound by this Agreement, the grievance shall be submitted to the Joint Coast Labor Relations Committee and shall be resolved there or referred to the Coast Arbitrator for hearing and decision in accordance with the applicable contract provisions.

**17.27** In the event that the Employer and Union members of the Joint Coast Labor Relations Committee fail to agree on any question before it, including a question as to whether the issue was properly before the Coast Labor Relations Committee, such question shall be immediately referred at the request of either party to the Coast Arbitrator for hearing and decision, and the decision of the Coast Arbitrator shall be final and conclusive.

**17.271** Referrals to the Coast Arbitrator must be submitted and heard by the Coast Arbitrator within 6 months following the date of disagreement at the Coast Labor Relations Committee level. Referrals not submitted within 6 months shall be considered "dropped."

**17.28** Miscellaneous provisions.

**17.281** Should either party fail to participate in any of the steps of the grievance machinery, the matter shall automatically move to the next higher level.

**17.282** If the local grievance machinery becomes stalled or fails to work, the matter in dispute can be referred at once by either the Union or the Association to the Joint Coast Labor Relations Committee for disposition.

**17.283** The hearing and investigation of grievances relating to discipline by return to the dispatching hall (Section 17.7), penalties (Section 17.8) and dispatching hall personnel (Section 8.23) shall be given precedence over all other business before the Joint Port and Joint Area Labor Relations Committees and before the Area Arbitrator. Either party may request that:

(a) grievances arising under Section 17.7 or involving dispatch hall disputes (except those covered by Section 17.151) be processed initially and from step to step within 24 hours; and

(b) failures to observe Area Arbitrators' awards be processed to the next step within 24 hours.

**17.284** Nothing in this Section 17 shall prevent the parties from mutually agreeing upon other means of deciding matters upon which there has been disagreement.

**17.3** Business Agents.

**17.31** To aid in prompt settlement of grievances and to observe Agreement performance, it is agreed that Business Agents as Union representatives shall have access to ships and wharves of the employer to facilitate the work of the Business Agent, and in order that the employer may cooperate with the Business Agent in the settlement of disputes the Business Agent shall notify the representative designated by the employer before going on the job.

**17.4** When any longshoreman (whether a registered long-shoreman or an applicant for registration or a casual long-shoreman) claims that he has been discriminated against in violation of Section 13 of this Agreement, he may at his option and expense, or either the Union or the Association may at its option and at their joint expense, have such complaint adjudicated hereunder, which procedure shall be the exclusive remedy for any such discrimination.

**17.41** Such remedy shall be begun by the filing of a grievance with the Joint Port Labor Relations Committee setting forth the grievance and the facts as to the alleged discrimination. Such a grievance shall be timely if presented within 10 days of the occurrence of the alleged discrimination. Such grievance shall be investigated by the Joint Port Labor Relations Committee at a regular or special meeting of the Committee at which the individual involved shall be permitted to appear to state his case, at which time he may present oral and written evidence and argument.

**17.411** With respect to any claim of violation of Section 13, the Joint Port Labor Relations Committee shall extend the time for filing of such claim beyond the time established in Section 17.41 whenever such extension is necessary because the period of limitation otherwise applicable is determined to be unlawful or because in the judgment of the Committee in the exercise of its sound discretion, such an extension is otherwise necessary to prevent inequity but in no event shall the time for filing of such claims be extended beyond 6 months from the date of the occurrence of the alleged discrimination.

**17.42** Either the Employers, the Union or the man involved may appeal the decision of the Joint Port Labor Relations Committee. Such appeal shall be to the Joint Coast Labor Relations Committee by letter addressed to the Joint Coast La-

88

bor Relations Committee. To be timely, such appeal must be delivered or mailed within 7 days of the decision of the Joint Port Labor Relations Committee.

**17.421** If such an appeal is taken within the time limits allowed, the Joint Coast Labor Relations Committee shall either confirm or reverse or modify the decision of the Joint Port Labor Relations Committee without any further hearing, or order a further hearing and thereupon issue its decision on the basis of the entire record including that at both hearings.

**17.43** An appeal from the decision of the Joint Coast Labor Relations Committee can be presented to the Coast Arbitrator (or by agreement of the Joint Coast Labor Relations Committee to an Area Arbitrator) by the individual involved, the Employers or the Union. An appeal to the Coast Arbitrator filed by an applicant for registration or a casual longshoreman involving the subject of registration shall be permitted only for those grievances which the Joint Coast Labor Relations Committee, in its sole discretion, certifies to the Coast Arbitrator that the facts introduced in support of the grievance into the record of the prior proceedings, if unrebutted, may support a finding of a violation of the grievant's Section 13 rights under this Agreement. Appeal shall be by a written request for an arbitrator's hearing mailed or delivered to the Union and the Employer representatives of the Joint Coast Labor Relations Committee if by an individual, or to the individual and the other party's representative on the Joint Coast Labor Relations Committee if by either the Union or the Employers. Such an appeal shall be timely only if such request for an arbitrator's hearing is so filed in writing with the Joint Coast Labor Relations Committee no later than 7 days after issuance of the decision of the Joint Coast Labor Relations Committee from which an appeal to an arbitrator is taken.

89

**17.431**  The arbitration procedure shall be carried on in accordance with the procedures generally applicable under this Agreement for arbitration before the Coast Arbitrator.

**17.5**  Arbitrators and Awards.

**17.51**  The parties shall have an arbitrator for each of the said 4 port areas and a Coast Arbitrator.

**17.511**  The Area Arbitrator shall be appointed by the Joint Coast Labor Relations Committee and shall serve at its discretion. If any Area Arbitrator shall at any time be unable or refuse or fail to act, the Joint Coast Labor Relations Committee shall select a successor or substitute.

**17.512**  The Coast Arbitrator shall be selected by the Joint Coast Labor Relations Committee to serve. He coextensive with the term of the Agreement. The Coast Arbitrator may be reappointed for the term of the next Agreement by mutual agreement of the Parties. The Coast Arbitrator shall be a highly qualified neutral arbitrator with maritime experience, located on the West Coast. If the Committee fails to agree on the selection of the Coast Arbitrator, the individual shall be selected by a 6-person panel of prominent industry representatives: 3 selected by the Union and 3 selected by the Employers.

**17.5121**  If after thirty (30) days, the Panel is unable to select a Coast Arbitrator, the Panel shall submit to the Federal Mediation and Conciliation Service (FMCS) a request for a list of seven (7) highly qualified neutral arbitrators with maritime experience, located on the West Coast. If the Union and the Employer representatives agree that the list is unacceptable, they may jointly request that the FMCS provide a second list. In the event, the Parties cannot mutually select a Coast Arbitrator from the FMCS Panel, the selection shall be determined by a striking process. The first strike shall be determined

arising under the Agreement including cases dealing with the resumption or continuation of work.

**17.53**  Arbitrators' decisions must be based upon the showing of facts and their application under the specific provisions of the written Agreement and be expressly confined to, and extend only to, the particular issue in dispute. The arbitrators shall have power to pass upon any and all objections to their jurisdiction. If an arbitrator holds that a particular dispute does not arise under the Agreement, then such dispute shall be subject to arbitration only by mutual consent.

**17.54**  In the event the parties agree that an arbitrator has exceeded his authority and jurisdiction or that he is involved in the industry in any other position of interest which is in conflict with his authority and jurisdiction, he shall be disqualified for any further service.

**17.55**  All decisions of the arbitrators, except as provided in Sections 17.261 and 17.6, shall be final and binding upon all parties. Decisions shall be in writing signed by the arbitrator and delivered to the respective parties.

**17.56**  All expenses and salaries of the arbitrators shall be borne equally by the parties, except where specifically provided herein to the contrary.

**17.57**  All decisions of arbitrators shall be observed and/or implemented. No decision of an Area Arbitrator, interim or formal, can be appealed unless it is observed and/or implemented.

**17.6**  Informal hearings and interim rulings:

**17.61**  When a grievance or dispute arises on the job and is not resolved through the steps of Sections 17.21 and 17.22, and it is claimed that work is not being continued as required by Section 11, a request by either party shall refer the matter to the Area Arbitrator (or by agreement of the Joint Coast Labor Relations Committee to the Coast Arbitrator) for his considera-

tion in an informal hearing; such referral may be prior to formal disagreement in any Joint Labor Relations Committee or upon failure to agree on the question in the Joint Area Labor Relations Committee. Such hearing may be ex parte if either party fails or refuses to participate, provided that the arbitrator may temporarily delay an ex parte hearing to permit immediate bona fide efforts to settle an issue without a hearing.

**17.62** The arbitrator shall act with his powers limited strictly to the application and interpretation of the Agreement as written. The parties shall have the right to present such views as they wish to the arbitrator, but it shall not be necessary to have a shorthand or stenotype reporter present to report the proceedings nor shall employment of counsel be necessary. The arbitrator, on this basis, shall promptly issue an oral interim ruling with respect to the grievance or dispute and thereafter confirm it in writing. An interim ruling shall be binding on the parties regarding the particular issue on the particular ship on the particular occasion but shall not be a precedent for other cases. Any interim ruling shall be binding unless reversed by a contrary decision after a formal hearing.

**17.63** If either party is dissatisfied with the interim ruling, the question shall be immediately referred at the request of such party to the arbitrator for hearing and decision in accordance with the normal procedure under Section 17.5 of this Agreement; the arbitrator shall then proceed as if there had been a failure to agree on the question by the Joint Port Labor Relations Committee, provided that the arbitrator may temporarily delay a hearing to permit prompt bona fide efforts to settle the question in the Port or Area Joint Labor Relations Committee.

**17.64** The use of the informal procedure leading to an interim ruling can be waived by consent of both parties with respect to any particular dispute or grievance. If at the begin-

ning of the informal procedure either party establishes a good faith claim that an issue, other than a dispute with respect to Section 11, is of general significance or that the formal procedure will be necessary to settle such issue, the arbitrator shall rule that the informal procedure be bypassed regarding such issue. In the absence of such waiver or decision to bypass, the arbitrator shall hold an informal hearing and issue an interim ruling regarding the dispute in accordance with the procedure set forth above.

**17.7** Discipline by return to the dispatching hall.

**17.71** The employer shall have the right to return to the dispatching hall any man (or to send home any nonregistered man) for incompetence, insubordination or failure to perform the work as required in conformance with the provisions of this Agreement.

**17.72** Such longshoreman shall not be dispatched to such employer until his case shall have been heard and disposed of before the Joint Port Labor Relations Committee, and no other employer shall refuse employment to such longshoreman on the basis of such return to the dispatch hall.

**17.73** If any man feels that he has been unjustly returned to the dispatching hall or dealt with, his grievance shall be taken up as provided in Section 17.2 beginning with Section 17.23.

**17.74** In case of return to the dispatching hall without sufficient cause, the Joint Port Labor Relations Committee may order payment for lost time or reinstatement with or without payment for lost time.

**17.75** When an employer returns a gang to the dispatching hall for cause, its gear priority terminates and such employer may carry on work at the hatch or gear involved without delay. The hatch or gear involved shall not stand idle because of any action or nonaction of the Union or longshoremen or the dis-

patching hall. A replacement gang shall be dispatched promptly upon order of the employer. Until the replacement gang turns to or if one is not ordered or cannot be dispatched, any other gang employed by the employer shall shift to the hatch or gear involved as directed by the employer. The returned gang shall not be redispatched to the job involved unless it is the only available gang and the Association requests that it be dispatched. The provisions of Sections 17.73 and 17.74 shall apply with respect to any gang returned to the dispatching hall for cause.

**17.8** Penalties for work stoppages, assault, pilferage, drunkenness, drug abuse and peddling, safety violations and other offenses.

**17.81** All longshoremen shall perform their work conscientiously and with sobriety and with due regard to their own interests shall not disregard the interests of the employer. Any employee who is guilty of deliberate bad conduct in connection with his work as a longshoreman or through illegal stoppage of work shall cause the delay of any vessel shall be fined, suspended, or for deliberate repeated offenses for which he has been found guilty under the Contract procedures, cancelled from registration. A determination that an onerous or health and safety claim made in good faith shall be disallowed is not a finding that a man is guilty of an offense within the meaning of this Section. Any employer may file with the Union a complaint against any member of the Union and the Union shall act thereon and notify the Joint Port Labor Relations Committee of its decision within 30 days from the date of receipt of the complaint. An employer shall not be required to appear nor need he participate in discipline by the Union of its members beyond the filing of complaints.

**17.811** If within 30 days thereafter the Employers are dissatisfied with the disciplinary action taken under Section 17.81,

then the following independent procedure of Section 17.82 may be followed, which procedure shall also be applicable in the case of longshoremen not members of the Union.

**17.82** The Joint Port Labor Relations Committee has the power and duty to impose penalties on longshoremen who are found guilty of stoppages of work, assault, refusal to work cargo in accordance with the provisions of this Agreement, or who leave the job before relief is provided, or who are found guilty of pilfering or broaching cargo or of drunkenness or who in any other manner violate the provisions of this Agreement or any award or decision of an arbitrator. In determining penalties neither the parties nor the arbitrators shall consider offenses that predate by 5 years or more the date of a current offense.

**17.821** Assault.

**17.8211** For first offense assault: Minimum penalty, 1 year suspension from work. Maximum penalty, discretionary.

**17.8212** For second offense assault: mandatory cancellation from registered list upon request of either party.

**17.8213** In either case such conviction shall not be dependent upon the existence of a prior court decision, nor shall the determination of guilt await a court decision.

**17.822** Pilferage.

**17.8221** For first offense pilferage: Minimum penalty, 60 days' suspension from work. Maximum penalty, discretionary.

**17.8222** For second offense pilferage: Mandatory cancellation from registered list upon request of the employer.

**17.823** Drunkenness or smoking in prohibited areas.

**17.8231** First offense: Suspension for 15 days.

**17.8232** Second offense: Suspension for 30 days.

**17.8233** Succeeding offenses: Minimum penalty, 60 days suspension. Maximum penalty, discretionary.

**17.824** Abuse or use of controlled substances and/or drugs on the job or in or around any employment premises or the dispatch hall.

**17.8241** First offense: Suspension for 15 days.

**17.8242** Second offense: Suspension for 30 days.

**17.8243** Succeeding offenses: Minimum penalty, 60 days suspension. Maximum penalty, discretionary.

**17.825** Sale and/or peddling of controlled substances and/or drugs on the job or in or around any employment premises or the dispatch hall.

**17.8251** For first offense: Minimum penalty, 1year suspension from work. Maximum penalty, discretionary.

**17.8252** For second offense: Mandatory cancellation from registered list upon request of either party.

**17.8253** In either case such conviction shall not be dependent upon the existence of a prior court decision, nor shall the determination of guilt await a court decision.

**17.826** An employee found to be in violation of reasonable verbal instructions, posted employer safety rules, and/or the PCMSC shall attend a 1-day safety class approved by the Coast Labor Relations Committee without pay. Failure to attend and complete the class as scheduled without a valid excuse shall result in suspension from work until the class is completed. In addition, the employee shall be subject to the following minimum discipline, which shall be applied uniformly without favoritism or discrimination.

**17.8261** First Offense: Letter of warning.

**17.8262** Second Offense: Suspension from work for 15 days.

**17.8263** Third Offense: Suspension from work for 60 days. Maximum penalty, discretionary.

**17.8264** Fourth Offense: Subject to deregistration.

**17.827** An employee who, knowingly and flagrantly disregards reasonable verbal instructions, posted employer safety rules, and/or the PCMSC, and who intentionally causes significant damage to equipment or cargo, or who intentionally injures himself or others, shall be subject to the following minimum discipline, which shall be applied uniformly without favoritism or discrimination.

**17.8271** First Offense: Suspension from work for 90 days. Maximum penalty, discretionary.

**17.8272** Second Offense: Subject to deregistration.

**17.828** Grievances arising under Sections 17.826 and 17.827 shall be subject to the grievance procedure of Section 17, with the following exceptions.

**17.8281** Grievances arising under Sections 17.826 and 17.827 shall be heard by the local parties within 30 days of the employee being cited. In the event the parties fail to resolve the grievance within the 30-day time period, the grievance shall be referred to the Area Arbitrator, at the request of either party, for an immediate hearing and decision.

**17.8282** In determining whether a violation under Sections 17.826 and 17.827 is a first, second, third or fourth offense, Section 17.82 shall govern.

**17.829** An employee released from the job for being under the influence of alcohol or drugs may request that his/her union representative report to the job. If the union representative, having observed the employee, believes the employee was unjustly released, he will discuss the case immediately with the employer. If the employer and union representative are unable to

reach agreement, or if the union representative does not immediately respond to the request to come to the job, the case shall be immediately referred at the request of either party to the Joint Port Labor Relations Committee which shall have the power and duty to investigate and adjudicate it. If the Joint Port Labor Relations Committee members present are unable to reach agreement, and/or if no Union member of the Joint Port Labor Relations Committee responds to the request to come to the job within 1 hour, the Area Arbitrator shall be immediately called to the job to decide if the employee was properly released. If the released employee fails to contact his/her union representative, or if the employee leaves the job, the employee shall be guilty as charged. Where an employee is guilty of working under the influence of alcohol or drugs the employee shall be subject to the penalties found in Section 17, and shall be referred to the ILWU-PMA employee assistance program.

**17.83**  Suspensions under the foregoing provisions shall follow convictions by either the Union grievance machinery or by the Joint Port Labor Relations Committee, either of whom shall accept a prior court decision. The court decision will be considered by the parties and they shall discount the penalties set forth above accordingly. Where a fine has been assessed then the days off on suspension shall be discounted at the rate of $5.00 per day. Any man suspended under these provisions shall not be dispatched for work in any port covered by this Agreement until the suspension penalty has been served.

**17.84**  Any longshoremen having records of habitual drunkenness or whose conduct on the job or in the dispatching hall causes disruption of normal harmony in the relationship of the parties hereto, or who physically assault anyone in the dispatching hall or on the job, or who have records of working in a manner that is hazardous to themselves or that endangers oth-

er workers shall not be dispatched to operate or used to operate any hoisting or mechanical equipment or devices or to supervise the operation of such equipment; or they shall be subject to such other remedy as the Joint Port Labor Relations Committee shall mutually consider appropriate.

**17.85**  In the event of disagreement at the Joint Port Labor Relations Committee level as to the imposition of penalties under this Section 17.8, the issue shall be processed immediately through the grievance procedure, and to the Area Arbitrator, if necessary.

**17.86**  The rules and penalties provided hereinabove shall be applicable to fully registered longshoremen and, except where a more stringent rule or penalty is applicable pursuant to Section 17.861, to limited registered longshoremen and to nonregistered longshoremen.

**17.861**  More stringent rules and penalties than those provided hereinabove that are applicable to limited registered longshoremen or to nonregistered longshoremen or to both such groups may be adopted or modified by unanimous action of the Joint Coast Labor Relations Committee and, subject to the control of such Committee so exercised, more stringent rules and penalties applicable to limited registered men or nonregistered men or to both groups that are provided in existing and future local joint working, dispatching, and registration rules and procedures or by mutually agreed practices shall be applicable.

## SECTION 18

# GOOD FAITH GUARANTEE

**18.1**  As an explicit condition hereof, the parties are committed to observe this Agreement in good faith. The Union commits the locals and every longshoreman it represents to observe

this commitment without resort to gimmicks or subterfuge. The Employers give the same guarantee of good faith observance on their part.

## SECTION 19

## UNION SECURITY

**19.1** All present fully registered employees who are members of the Union on the date of execution of the Agreement, shall remain members of the Union in good standing as a condition of employment.

**19.2** All present fully registered employees who are not members of the Union on the date of execution of the Agreement shall become and remain members in good standing of the Union as a condition of employment.

**19.21** The Union hereby agrees to indemnify the Association and each member of the Association against any award, judgment, loss or expense arising out of a legal claim made against the Association or any company that is a member of the Association by a registered longshoreman or clerk, described in Section 19.2, because of deregistration or denial of full work opportunity at the request of the Union or any Union local pursuant to the provisions of Section 19.2.

**19.3** Any employee who becomes fully registered during the life of the Agreement shall, 30 days thereafter, become and remain a member of the Union in good standing as a condition of employment.

**19.4** A fully registered employee who, 30 days after said registration, has failed to acquire or thereafter maintain membership in the Union as here provided shall be removed from the registration list and deregistered 30 days after notice from the Union that he is not a member in good standing.

**19.5** A Union member shall be considered in good standing if he makes timely tender of the periodic dues, and initiation fees uniformly required as a condition of becoming and remaining a member in the Union.

## SECTION 20

## PAY GUARANTEE PLAN, RULES, AND ADMINISTRATION

This Pay Guarantee Plan continues and is an extension of the Pay Guarantee Plan provided in the Memorandum of Understanding of February 10, 1972, as amended through July 1, 1993.

## Preamble

The basic intention of the Pay Guarantee Plan (hereinafter PGP) is to provide a weekly income to eligible registered men.

**20.1** For each year of the Agreement the Employers will have a contingent liability for the Pay Guarantee Plan for the following amounts:

| | | |
|---|---|---|
| First year | (7/1/02 to 6/30/03)............ | $24,960,000 |
| Second year | (7/1/03 to 6/30/04)............ | $20,020,000 |
| Third year | (7/1/04 to 6/30/05)............ | $20,020,000 |
| Fourth year | (7/1/05 to 6/30/06)............ | $24,960,000 |
| Fifth Year | (7/1/06 to 6/30/07)............ | $20,020,000 |
| Sixth Year | (7/1/07 to 6/30/08)............ | $20,020,000 |

**20.11** In the first year $6,240,000 will be made available each quarter; in the second year $5,005,000 will be made available in each quarter; in the third year $5,005,000 will be made available each quarter; in the fourth year $6,240,000 will be made available each quarter; in the fifth year $5,005,000 will be made available in each quarter; in the sixth year $5,005,000 will be made available in each quarter.

BLUEBIRDOnline.com (800) 277-0708

Exhibit  B

| | | |
|---|---|---|
| IN THE MATTER OF CONTROVERSY | ) | NCAA-034-2007 |
| | ) | |
| BETWEEN | ) | INTERIM DECISION |
| | ) | of |
| INTERNATIONAL LONGSHORE | ) | |
| AND WAREHOUSE UNION, LOCAL 10 | ) | Terry N. Lane |
| | ) | |
| AND | ) | Northern California Area Arbitrator |
| | ) | |
| PACIFIC MARITIME ASSOCIATION | ) | Under the Authority of the |
| | ) | Pacific Coast Longshore Contract Document |
| Re: Employer Claim of a Slowdown by | ) | 2002 – 2008 |
| Longshore Workers in Violation of Section 11.1, | ) | |
| Maersk Dublin, APM Terminals, Berth 24, | ) | Oakland, California |
| Oakland | ) | |
| | ) | |

The hearing was held at 5:10 p.m. on Saturday, August 18, 2007, in the dock office at APM Terminal, Berth 24 Oakland. The parties were afforded an opportunity to present evidence and argument. There was no transcript made of the hearing.

APPEARANCES:

FOR THE EMPLOYERS:        Dan Kaney
Pacific Maritime Association

Kurt Sulzbach
Quentin Yang
Mark Simpson
APM Terminals

FOR THE UNION:        Melvin MacKay
Lonnie Francis
ILWU Local 10

ISSUE:

Whether ILWU Local 10, its officials and members, were engaged in a slowdown tantamount to a work stoppage on the first shift, August 18, 2007, on the vessel Maersk Dublin.

BACKGROUND:

Work stoppages by marine clerks have been determined by the Area Arbitrator at this facility on the second shift of August 14, 2007 and the first shift on August 15, 2007. A hearing under Section 17.61 was held for the first shift of August 16, 2007 about longshore work on the vessel Maersk Boston. This Arbitrator denied the Employers' motion that there was a slowdown tantamount to a work stoppage by ILWU Local 10 longshore workers based on the testimony and evidence at the hearing. The walking bosses are steady employees at the terminal. The crane operators are steady 9.43 employees at the terminal.

NCAA-034-2007                                                                                            Page 2
August 18, 2007

EMPLOYERS POSITION:

The Employers submitted a Production Log of container moves for the two cranes working the Maersk
Dublin on August 18, 2007. From 0800 to 1200 hours, the adjusted gross count for the Maersk Dublin
was down 43% compared to a five-week average for similar vessel service. Based on the move count
from 1300 to 1500 hours, the shift was projected to be reduced 30% compared to the same five-week
average. Employers' witnesses testified about these statistics and were subject to cross-examination.
Employers' witness Quentin Yang testified that his observation of the operation was that the crane
operators were not performing in the normal, efficient manner and there were delays because tractor
drivers were not under the hook.

At 1300 hours, the employer directed the walking bosses to instruct the crane operators and tractor drivers
to return to the usual, normal, safe, efficient operation.

The Employers made the following motions:

1.    ILWU Local 10 officials and members are in violation of Section 11.1 by engaging in a slowdown
      tantamount to a work stoppage.

2.    ILWU Local 10, its officials and members, shall cease the slowdown and the Union shall advise its
      members to work as directed in accordance with Section 11.31.

3.    ILWU Local 10 shall submit any underlying dispute to the formal grievance machinery.

UNION POSITION:

The Union maintains that there is not a slowdown. The pace of the operation is documented in detailed
notes from each of the walking bosses. The notes were submitted as evidence. Testimony from walking
boss Fred Gilliam was provided by conference telephone in support of the notes he prepared. It was
testified that difficulties for the crane operators included having to hoist up and over four-high containers,
bad pins, and loading twenty-foot containers in forty-foot cells. The Union argued that the numerical log
provided by the Employers does not accurately tell the story of what is happening in the actual work
being performed on the ship. The Union also argued that the Production Log adjusted gross numbers
were improved when the Maersk Dublin is compared to Maersk Boston on August 16, 2007. The
Arbitrator ruled there was not a slowdown on the Maersk Boston.

DISCUSSION:

The Production Log exhibit shows that the reduction in container moves is significant when compared to
longshore operations of similar vessel service for the previous five weeks. The walking boss notes list the
difficulties that were encountered during the first shift on the Maersk Dublin. The testimony of the
Employers' witnesses and the walking boss was that there was not any unusual cause for delay or
extenuating circumstances on this shift. The difficulties listed are usual and normal for the comparable
vessel operations in previous weeks.

The operation improved during the afternoon after the arrival of Local 10 officials for the LRC meeting
requested by the Employers. The ship normally would have finished by 1700 hours. It worked beyond
1800 hour to finish.

It is my opinion that there was a slowdown during the first shift of August 18, 2007 on the Maersk
Dublin. The result was that the ship departure was delayed and the payment of extended hours to finish

NCAA-034-2007                                                                          Page 3
August 18, 2007

the ship was required.  This result created economic pressure on the employer.  The slowdown was tantamount to a work stoppage in violation of Section 11.1.

DECISION:

The Employers' motions are granted:

1.    ILWU Local 10 officials and members are in violation of Section 11.1 by engaging in a slowdown tantamount to a work stoppage.

2.    ILWU Local 10, its officials and members, shall cease the slowdown and the Union shall advise its members to work as directed in accordance with Section 11.31.

3.    ILWU Local 10 shall submit any underlying dispute to the formal grievance machinery.

_____
Terry N. Lane
Northern California Area Arbitrator

Dated:  August 20, 2007

BLUEBIRDonline.com (866) 477-0706 AK-ST

Exhibit  C

| | | |
|---|---|---|
| IN THE MATTER OF CONTROVERSY | ) | NCAA-036-2007 |
| | ) | |
| BETWEEN | ) | INTERIM DECISION |
| | ) | of |
| INTERNATIONAL LONGSHORE | ) | |
| AND WAREHOUSE UNION, LOCAL 10 | ) | Terry N. Lane |
| | ) | |
| AND | ) | Northern California Area Arbitrator |
| | ) | |
| PACIFIC MARITIME ASSOCIATION | ) | Under the Authority of the |
| | | Pacific Coast Longshore Contract Document |
| Re: Employer Claim of a Slowdown by | ) | 2002 – 2008 |
| Longshore Workers in Violation of Section 11.1, | ) | |
| Sealand Enterprise, APM Terminals, Berth 24, | ) | Oakland, California |
| Oakland | ) | |
| | ) | |

The hearing was held at 3:15 p.m. on Wednesday, August 22, 2007. The partiers met on the dock adjacent to the ship and observed the operation and then moved to the dock office at the APM Terminals, Berth 24, Oakland. The parties were afforded an opportunity to present evidence and argument. There was no transcript made of the hearing.

APPEARANCES:

FOR THE EMPLOYERS:    Dan Kaney
             Kevin Nore
             Pacific Maritime Association

             Kurt Sulzbach
             Quentin Yang
             APM Terminals

FOR THE UNION:      Thomas Clark
             Frank Gaskin
             James Blackwell
             ILWU Local 10

WITNESSES:        Mark Simpson, General Manager, APM
             Nick Harnal, Operations Manager, APM
             Warren MacQuarrie, Safety and Security Manager, APM
             Samuel Turnbull, #9297, Crane Operator
             Padrig Fahey, #9283, Crane Operator
             Tom Villeggiante, #8812, Walking Boss

ISSUE:

Whether ILWU Local 10, its officials and members, were engaged in a slowdown tantamount to a work stoppage on the first shift, August 22, 2007 on the vessel Sealand Enterprise.

## BACKGROUND:

Work stoppages by marine clerks have been determined by the Area Arbitrator at this facility on the second shift of August 14, 2007 and the first shift on August 15, 2007. A hearing was held on the first shift of August 16, 2007 about longshore work on the vessel Maersk Boston. This Arbitrator denied the Employers' motion that there was a slowdown tantamount to a work stoppage by ILWU Local 10 longshore workers based on the testimony and evidence at the hearing. A hearing was held on August 18, 2007 about longshore work on the vessel Maersk Dublin. This Arbitrator granted the Employers' motions that there was a slowdown tantamount to a work stoppage by ILWU Local 10, its officials and members.

The walking bosses are steady employees at the terminal. The crane operators are steady 9.43 employees at the terminal.

## EMPLOYERS POSITION:

The Production Log of adjusted gross hourly counts from 0800 to 1200 hours showed that container moves are reduced 27.3% when compared to a five-week average for the same vessel service. During the hearing, this exhibit was updated to 1700 hours and showed the container moves continue to be reduced by 23.9%. The term adjusted gross moves means that down time of the cranes or other significant delays have been factored in to the average production numbers.

The Employers also submitted a five-week recap of the same vessel service, identified as PEX Service, showing the total moves per crane on the two ships in this service. The Sealand Enterprise and the Sealand Pacific are the two ships and they are identical as far as stowage and vessel design. One of these ships is worked every Wednesday at the APM terminal. The moves per gang and the ship completion time for the past five weeks was compared to the vessel moves and anticipated completion time for the Sealand Enterprise on this date. This exhibit is evidence of significantly reduced productivity for the same ships when compared to the prior five weeks.

Employers' witnesses Mark Simpson and Nick Harnal testified that their observations of the Sealand Enterprise this date included a slowing of the operation by crane operators and tractor drivers not being under the cranes. Specifically, the crane operators were waiting for the chassis to be pulled out from under the container before hoisting to the ship; slowing the descent of the bridle 10 feet to 15 feet excessively high before landing on a container; the path of the crane load was a square arc rather than a curved arc; and crane gantry and trolley movement was much slower than usual.

The Employers made the following motions:

1.   ILWU Local 10, its officials and members, are in violation of Section 11.1 by engaging in a slowdown tantamount to a work stoppage.

2.   ILWU Local 10 is in violation of Arbitration Decision NCAA-034-2007 and has failed to implement the award in accordance with Section 17.57.

3.   The local grievance machinery is stalled and failing to work and the matter in dispute shall be referred to the next step of the grievance machinery in accordance with Section 17.282.

## UNION POSITION:

The Union submitted detailed notes from the walking boss on the dock and a walking boss assigned to the forward crane. The Union maintains that these notes include numerous examples of delays such as bad pins, crane lost power, no tractors under crane, and no crane landing light.

Two steady crane operators testified about PCMSC Rules that require floating the load and a general emphasis on safety by APM Terminals management. It was also testified that the Wednesday ships require cranes to boom up, bumps, to wait for boxes, and the handling of single 20-foot containers.

The walking boss on the dock testified that the operation this date was different because there were three cranes working which adds to congestion. He also testified that there were crane operators waiting for tractors to arrive with chassis and there were stuck pins on chassis. The walking boss also testified that he feels harassed by APM management when he is ordered to instruct longshoremen to work in the usual, normal, efficient production. He feels this is a speedup of the operation.

The steady crane operator witnesses provided a signed question form prepared by Local 10. This form asked questions which included (and are paraphrased herein): did the crane operator create a slowdown on this date?; did the officers of Local 10 make a concerted and deliberate effort to have you slow down today?; and were you coerced by an officer of Local 10 to create a slowdown on this date? The crane operator witnesses answered no to these questions. The Union argued that the officials and membership of the Local have not been involved in a slowdown. The Union maintains that its officials are cooperating fully with the APM management and are participating in the grievance machinery to address the Employers' complaints. There is no slowdown by ILWU Local 10, the Union has implemented-NCAA-034-2007, and there is no concerted action by ILWU Local 10.

## DISCUSSION:

The Production Log and PEX Service recap for the August 22, 2007 operation on the Sealand Enterprise show a significant reduction in container moves when compared to the five-week average figures. The employer witnesses' testimony about their observations of slow cranes and no tractors under the hook are consistent with the reduction in container moves.

The Union exhibits of the walking boss logs do not show significant extenuating circumstances that would justify the 23.9% reduction in container moves. The separate difficulties listed are identified by the employer witnesses as the usual and normal difficulties on the comparable operations in the prior five-week average of the Production Log. It was testified that a three-crane operation adds to congestion. It was the testimony of both the employer and crane operator witnesses that one of the problems this date was that there were no tractors and chassis under the cranes. There was no observation by the parties or other evidence that congestion was a problem on this date.

There was extensive testimony about the PCMSC Rules 821, 822, and 823. These rules require the floating of a container by the crane operator before it is landed or hoisted. The Arbitrator observed this procedure while viewing the operation under the cranes. There was no evidence to support a claim that the proper use of these rules caused a slowdown in the operation on this date.

Based on all of the evidence and testimony, it is my opinion that a slowdown tantamount to a work stoppage in violation of Section 11.1 did occur on August 22, 2007 on the Sealand Enterprise. The slowdown was caused by the ILWU Local 10 employees working on the terminal. The ship sailing was delayed and required the payment of extended hours to finish. These factors put economic pressure on the employer.

It is also my opinion that the Local 10 officials are not engaged in a slowdown and have been using their best efforts to resolve the dispute. The Local 10 officials are responsible for securing observance of the Agreement, for advising Local 10 members to cease and desist the slowdown, and to implement arbitration decisions in accordance with Section 17.57.

The Employers requested a ruling in accordance with Section 17.282 that the local grievance machinery has failed to work. This Arbitrator has issued decisions finding ILWU Locals at the APM Terminals guilty of Section 11.1 violations on August 14, 2007, August 15, 2007, August 18, 2007, and this ruling on August 22, 2007. Additionally, the Joint Port Labor Relations Committee has met to resolve Section 11.1 claims during this time period that were not referred to a Section 17.61 hearing.

Section 11.1 is a "No work stoppages" commitment between the ILWU and the PMA that is an essential provision of the Pacific Coast Longshore and Clerks Agreement. It is my opinion that the good-faith efforts to resolve this dispute have failed in the local grievance machinery. The Employers' motion under Section 17.282 is granted.

DECISION:

1.    The ILWU Local 10 longshoremen at the APM Terminals did engage in a slowdown tantamount to a work stoppage in violation of Section 11.1 on August 22, 2007 on the Sealand Enterprise.

2.    ILWU Local 10 has not implemented Decision NCAA-034-2007. ILWU Local 10 officials shall instruct the longshoremen at the APM Terminals to cease and desist from violating Section 11.1 and to implement Arbitration Decisions in accordance with Section 17.57.

3.    The local grievance machinery has failed to work and the matter in dispute is referred to the next step of the grievance machinery in accordance with Section 17.282.

*Terry N Lane*

_____
Terry N. Lane
Northern California Area Arbitrator

Dated: August 23, 2007

BLUEBIRDonline.com (888) 477-0700  ALS7

Exhibit  D

IN ARBITRATION PROCEEDINGS PURSUANT TO THE
PACIFIC COAST LONGSHORE CONTRACT DOCUMENT

| | | |
|---|---|---|
| INTERNATIONAL LONGSHORE AND WAREHOUSE UNION,<br><br>Union,<br><br>and<br><br>PACIFIC MARITIME ASSOCIATION,<br><br>Employers.<br><br>Re: Slowdown at APM Terminals Oakland and breakdown of grievance machinery | ]<br>]<br>]<br>]<br>]<br>]<br>]<br>]<br>]<br>]<br>]<br>]<br>]<br>]<br>]<br>] | C-06-2007<br><br>OPINION and DECISION<br><br>of<br><br>JOHN KAGEL<br>Coast Arbitrator<br><br>September 4, 2007<br><br>Palo Alto, California |

APPEARANCES (by telephone):

For the Union: Leal A. Sundet, Coast Labor Relations Committee Member, San Francisco, CA

For the Employer: Richard Marzano, Director, Contract Administration and Arbitration, San Francisco, CA

DISCUSSION:

In NCAA-036-2007 Area Arbitrator Lane decided:

> "1. The ILWU Local 10 longshoremen at the APM Terminals did engage in a slowdown tantamount to a work stoppage in violation of Section 11.1 on August 22, 2007 on the Sealand Enterprise.

2. ILWU Local 10 has not implemented Decision NCAA-034-2007. ILWU Local 10 officials shall instruct the longshoremen at the APM Terminal to case and desist from violating Section 11.1 and to implement Arbitration Decisions in accordance with Section 17.57.

3. The local grievance machinery has failed to work and the matter in dispute is referred to the next step of the grievance machinery in accordance with Section 17.282."

The matter was referred to the JPLRC and the CLRC where disagreement was reached. Pursuant to the Employers' motion the matter was then referred to the Coast Arbitrator in accordance with the PCLCD. After a telephonic hearing the following decision is made:

DECISION:

1. The ILWU Local 10 longshoremen at the APM Terminals shall forthwith cease and desist from engaging in slowdowns at that location.

2. ILWU Local 10 officials shall continue to instruct the longshoremen at the APM Terminal to cease and desist from violating Section 11.1 and to implement arbitration decisions in accordance with Section 17.57.

3. This decision, served by e-mail to the Parties, is to the same effect as if signed by the Coast Arbitrator and thereafter hand delivered to the Parties.

s/ John Kagel

Coast Arbitrator

Exhibit E

 **Pacific Maritime Association**
**Headquarters**

September 6, 2007

<u>*(Via Fax and Email)*</u>

Mr. Tom Clark, President
ILWU Local 10
400 North Point Street
San Francisco, CA 94133

Re:    **Continuing Work Slowdowns at APM Terminals - Oakland**

Mr. Clark:

As you are aware, on Tuesday, September 4, 2007, Coast Arbitrator Kagel issued a ruling directing the ILWU Local 10 longshoremen at the APM Terminals to cease and desist from engaging in slowdowns at that location. (Award Attached)

On the day shift of Wednesday, September 5, 2007, ILWU Local 10 longshore workers continued the illegal work slowdown against APM Terminals. Due to Local 10's refusing to comply with the Coast Arbitrator's decision, PMA and APM Terminals have no choice but to proceed to federal court on Thursday, September 6, 2007, and seek injunctive and other appropriate relief.

Regards,

Richard Marzano, Director
Contract Administration and Arbitration

cc.    F. Gaskin, ILWU Local 10
CSC
K. Sulzbach, APMT
M. Simpson, APMT
S. Hennessey, PMA
C. Epperson, PMA
T. Edwards, PMA

555 MARKET STREET, 3RD FLOOR • SAN FRANCISCO, CA 94105
PHONE: (415) 576-3200 • FAX: (415) 348-8437
http://www.pmanct.org